A00A1812. MOORE v. PITT-DESMOINES, INC. et al.
A00A1813. R & L CARRIERS, INC. v. PITT-DESMOINES, INC.
(538 SE2d 155)

ELDRIDGE, Judge.

John W. Moore was a relief driver riding in a R & L Carriers, Inc. tractor-trailer driven by his co-worker Shawn Andre Searcey when the vehicle was rear-ended by a Pitt-DesMoines, Inc. tractor-trailer driven by Robert Thomas Cheatham. Moore collected workers' compensation from R & L Carriers for his injuries and sued Cheatham and Pitt-DesMoines for his injuries; R & L Carriers intervened to protect its subrogation lien. The trial court granted summary judgment to the defendants. We reverse, because there exists a jury issue as to negligence.

In the early morning hours of July 3, 1996, four tractor-trailers in convoy traveled west along Interstate 20 from South Carolina to Atlanta. The lead vehicle was a Pitt-DesMoines tractor-trailer driven by Marvin Sharpe. The second vehicle was R & L Carriers' truck driven by Searcey with Moore as relief driver. In the third vehicle, another Pitt-DesMoines truck, was defendant Cheatham followed by a fourth vehicle and a third Pitt-DesMoines tractor-trailer driven by Ralph. While in convoy, the Pitt-DesMoines drivers, including Cheatham, kept in constant communication by CB radio. Searcey monitored the CB talk of the Pitt-DesMoines drivers and heard Cheatham on the CB.

About 4:15 a.m., as the convoy approached Augusta near the

overpass and Exit 64 for the I-520 Bobby Jones Expressway Interchange, Searcey saw three broken 80-pound bags of cement in the road ahead with cement dust kicked up by vehicles in front of him; there was about two inches of cement dust lying on the road. Searcey was about 100 feet east of I-520 when he first saw the cement dust in the air. Searcey's truck was in the right lane, and another truck in the left lane caused the dust to become worse as they drove through it. At the same time that he saw the cement dust, Searcey heard Sharpe in the lead Pitt-DesMoines truck warn of the dust ahead over the CB; the evidence reflected that Sharpe had also seen a truck ahead drop the cement bags on the interstate. Searcey realized what was happening and woke Moore to warn him to brace himself. He was worried about hitting a car in the dust cloud and began pulling into the right emergency lane as soon as he cleared the overpass.

Richard T. Dedeaux was driving between 65 and 70 mph in his car when he came to the overpass and saw the cement dust. He was passing Searcey in the left lane, following another tractor-trailer, when he entered the cement dust. He saw the cement dust about ten to fifteen seconds before he hit the truck ahead of him. The car-truck collision was near where Searcey finally stopped, which was on the far side of the interchange beyond the overpass. The truck he hit kept going and never stopped after the collision. Mrs. Dedeaux stated that apparently Cheatham's truck was "flying towards us. . . . If they had been in our lane . . . we would have been dead." Prior to the second collision, the R & L Carriers truck stopped to their right. After the second collision between the trucks, Dedeaux pulled his car over into the left emergency lane.

When Searcey first saw the dust on the overpass, he was driving 55 mph but immediately began slowing down because of the hazardous condition. At the time of impact, he had reduced his speed to about 20 mph when he was impacted from the rear. At the time of impact, he had pulled over into the emergency lane prior to stopping. When he cleared the overpass and was three-tenths of a mile away from the overpass, Searcey pulled into the emergency lane and began to stop. Cheatham followed Searcey into the emergency lane instead of staying in the right lane. Searcey stated that Cheatham's tractor-trailer was straight after impact, which in his opinion indicated that Cheatham's vehicle impacted Searcey's vehicle without stopping, because Cheatham's truck and trailer would have jackknifed. In Searcey's opinion, Cheatham was going 30 to 40 mph on impact. After impact, the R & L Carriers tractor was jackknifed, the tractor sideways in the right lane and the trailer straight in the emergency lane.

Ralph, the third Pitt-DesMoines driver, successfully cleared the

cement dust and stopped about three feet behind Cheatham. Two Pitt-DesMoines trucks, Searcey's truck, and another truck cleared the overpass and cement dust without running into anything. Ralph did this, although Cheatham and Searcey were piled up in the emergency lane and right lane, and Dedeaux's car was stopped in the left emergency lane.

According to Cheatham, he began to brake as he entered the cement dust on the overpass, but was unable to stop. He drove into the emergency lane and rear-ended the R & L Carriers tractor-trailer, which he followed. Cheatham denied hearing the CB warning to slow down and to look out ahead from the lead Pitt-DesMoines driver, Sharpe, although Searcey heard the warning. Cheatham testified that as he crossed the overpass he did not see anything ahead, but that when he came to the end of the overpass he drove into a thick fog. Cheatham claimed that the trucks were several hundred yards apart traveling along the interstate. He testified that he was at the speed limit and immediately began to break upon entering the dust cloud, which in his opinion dropped his speed to 30 or 40 mph; he was in the right lane. He saw a car's brake lights at his left front wheel; then, instantly the truck's taillights appeared ahead of him. He also stated that he saw the R & L Carriers vehicle stopped ahead of him on I-20 before he hit it, and he was in the right lane. Cheatham stated that immediately after the collision Sharpe, the first Pitt-DesMoines driver, came back and stated that he passed safely in the left lane and that the R & L Carriers truck was jack-knifed in the right lane. However, Cheatham also testified that the third Pitt-DesMoines driver, Ralph, saw his wreck and pulled up beside his truck.

The plaintiffs' contention is that the trial court erred in granting summary judgment. We agree and reverse.

> All drivers . . . using the highways are held to the exercise of due care. A leading vehicle has no absolute legal position superior to that of one following. Each driver must exercise ordinary care in the situation in which he finds himself. The driver of the leading vehicle must exercise ordinary care not to stop, slow up, nor swerve from his course without adequate warning to following vehicles of his intention so to do. The driver of the following vehicle, in his turn, must exercise ordinary care to avoid collision with vehicles, both those in front and those behind him. Just how close to a vehicle in the lead a following vehicle, ought, in the exercise of ordinary care, be driven, just what precautions a driver of such a vehicle must in the exercise of ordinary care take to avoid colliding with a leading vehicle which slows, stops, or

swerves in front of him, just what signals or warnings the driver of a leading vehicle must, in the exercise of due care, give before stopping or slowing up of his intention to do so, may not be laid down in any hard and fast or general rule. In each case except when reasonable minds may not differ, what due care required, and whether it was exercised, is for the jury.

(Citation and punctuation omitted.) *Atlanta Coca-Cola Bottling Co. v. Jones,* 236 Ga. 448, 450 (224 SE2d 25) (1976).

There here exists an issue of fact as to whether or not Cheatham maintained a proper lookout ahead of the road, because he did not see the cement dust cloud until he entered it near the end of the overpass. However, Searcey testified that both he and Sharpe saw the cement dust about 100 feet before the site where the broken cement bags were in the road at a time when the cloud was not as great as when Cheatham approached the cloud of dust. Presumably the unknown trucker, Searcey, Sharpe, Ralph, and even Dedeaux saw the cement dust prior to entering it. Thus, a factual issue of negligence exists as to why Cheatham did not see the massive cloud of cement dust that he called a "fog" before he entered it. "What is a reasonable lookout depends on all the circumstances at the time and place. Issues of negligence should not be dealt with by summary adjudication but should be returned to the rightful province of the jury." (Citation and punctuation omitted.) *Beringause v. Fogleman Truck Lines,* 200 Ga. App. 822, 823 (1) (409 SE2d 524) (1991).

There also exists a factual issue as to why Cheatham was not alert enough to hear Sharpe's CB warning to slow down because of the cement dust in the road, which Searcey heard and which should have alerted Cheatham, if he were insufficiently attentive to the road ahead to see the dust cloud. Failing to keep a proper lookout ahead and failing to be alert to the CB warning raise issues of fact as to whether Cheatham negligently failed to keep a proper lookout for danger and traffic when he was 100 to 200 yards behind Searcey. In contrast, four other trucks negotiated the cement cloud without hitting anything, which a jury can consider as a reasonable standard of care for a trucker.

Cheatham testified that he did not begin to brake and to slow down until he entered the cement cloud. In contrast, even Dedeaux began to slow his car down and brake before entering the cloud. Searcey, Sharpe, Ralph, and the other truck driver were able to slow down and stop or negotiate the cement powder cloud without colliding with anyone at an appropriately reduced speed for the hazards and conditions then and there existing. Dedeaux testified that he was driving 65 to 70 mph before the collision; while Cheatham claimed to

be going 55 mph in a heavily loaded, difficult to stop, tractor-trailer before the collision and that he was going 30 to 40 mph at the time of the collision. These are speeds that a jury might reasonably find were too fast for special road hazards, conditions, and traffic where both drivers rear-ended a lead vehicle. OCGA § 40-6-180. If Searcey were 100 to 200 yards ahead of Cheatham and was traveling at 20 mph at the time of the collision, then a jury could find that, relative to Searcey's speed, Cheatham was traveling too fast for conditions, because he overtook Searcey to rear-end him. See *Franklin v. Hennrich*, 196 Ga. App. 372, 375 (2) (b) (395 SE2d 859) (1990); *Smith v. Hardy*, 144 Ga. App. 168, 169 (1) (240 SE2d 714) (1977).

Mrs. Dedeaux testified that it looked like Cheatham was about to hit them. Cheatham testified that the car's taillight was at his left front wheel when he saw the truck's taillights ahead of him. A jury could reasonably infer from this that Cheatham swerved to avoid striking the car, saw the truck's taillights, and drove toward the lights, believing that the truck ahead was moving. Thus, there is an issue of fact whether or not Cheatham was negligent in failing to stay in his right lane by driving into the left lane toward Dedeaux and then driving into the emergency lane into Searcey. See OCGA § 40-6-48 (1); see generally *Davis v. State*, 236 Ga. App. 32 (510 SE2d 889) (1999).

The trial court used the wrong legal standard in granting summary judgment: "this court finds that there is insufficient evidence in the record to create a jury issue as to whether Cheatham was negligent so as to cause the Plaintiffs' injuries." Even under *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (4) (405 SE2d 474) (1991), the standard is that the slightest evidence on each material element presented by the plaintiff is sufficient to create a jury issue. See *Svc. Merchandise v. Jackson*, 221 Ga. App. 897, 898-899 (1) (473 SE2d 209) (1996); see also *Bruno's Food Stores v. Taylor*, 228 Ga. App. 439, 440-441 (491 SE2d 881) (1997) (physical precedent only); *BBB Svc. Co. v. Glass*, 228 Ga. App. 423, 425-429 (491 SE2d 870) (1997) (physical precedent only). Negligence is not susceptible to summary adjudication except where the evidence is plain, palpable, and indisputable that the respondent cannot present any slight evidence on each essential element of the action in rebuttal to create a jury issue. See generally *Robinson v. Kroger Co.*, 268 Ga. 735, 745-748 (2) (493 SE2d 403) (1997). "The grant of summary judgment is authorized only when there is no remaining genuine issue of material fact *and* the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c)." (Emphasis in original.) *Dental One Assoc. v. JKR Realty Assoc.*, 269 Ga. 616, 617 (1) (501 SE2d 497) (1998).

In *Hambrick v. B. G. Swing Games Mgmt.*, 267 Ga. 597, 599 (481 SE2d 816) (1997), the Supreme Court set forth how the respondent

must meet the burden on motion for summary judgment.

> If the moving party discharges this burden [under *Lau's Corp.*, supra], the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. . . . It appears, therefore, that [movants] have carried their burden under *Lau's Corp.*, supra, to point out an absence of evidence to support [plaintiffs'] case, but [plaintiffs] have not borne their responsibility to point to specific evidence giving rise to a triable issue.

(Punctuation omitted.) However, in this case, plaintiffs have pointed to specific evidence that creates material issues of fact for the jury's determination as to the defendants' negligence. Accordingly, summary judgment was not authorized.

*Judgment reversed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED AUGUST 9, 2000 —
RECONSIDERATION DENIED AUGUST 28, 2000 — 

*Graydon W. Florence, Jr.*, for appellant (case no. A00A1812).
*Drew, Eckl & Farnham, Bruce A. Taylor, Jr.*, for appellant (case no. A00A1813).
*Swift, Currie, McGhee & Hiers, Kristine J. Moschella, James T. McDonald, Jr., James I. Creasy III*, for appellees.